IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,
*ex rel.* SETHINA FORUNATÈ and
MICHAEL HOCAKDAY,

and

COMMONWEALTH OF VIRGINIA
*ex rel.* SETHINA FORTUNATÈ and
MICHAEL HOCKADAY,

          Plaintiffs,

v.                                        Civil Action No. 3:16cv653

NDUTIME YOUTH & FAMILY
SERVIES, INC., *et al.*,

          Defendants.

## MEMORANDUM OPINION

Plaintiffs Sethina Fortunatè and Michael Hockaday allege that their former employer,

NDUTIME Youth and Family Services ("NDUTIME"), and Teshana D. Gipson, (collectively,

"Defendants"), presented to the government false or fraudulent claims for payment.[1] (Fortunatè

Compl., 3:16cv653, ECF No. 1; Hockaday Compl., 3:16cv767, ECF No. 5.) The United States

and the Commonwealth of Virginia (collectively, the "Government") intervened in this *qui tam*

action and filed a joint complaint in intervention.[2] (Joint Compl., ECF No. 25.) This matter

---

[1] On November 8, 2019, the Court consolidated the actions brought by Fortunatè and
Hockaday after finding that the "cases have common questions of law and fact, that
consolidation will reduce the costs and delay for all parties and the Court, and . . . in the interests
of justice." (Nov. 8, 2019 Order, ECF No. 24.) Case number 3:16cv767, which Hockaday
initially filed, proceeds under the instant case number 3:16cv653.

[2] "A private enforcement action under the [False Claims Act] is called a *qui tam* action,
with the private party referred to as the relator." *U.S. ex rel. May v. Purdue Pharma L.P.*, 737
F.3d 908, 911 n.1 (4th Cir. 2013) (internal quotation marks and citation omitted). "'Qui tam' is

comes before the Court on three motions brought pursuant to Federal Rule of Civil Procedure

12(b)(6):[3]

    (1)    Defendants' Motion to Dismiss the Joint Complaint in Intervention (the "Motion to Dismiss Joint Complaint"), (ECF No. 51);

    (2)    Defendants' Motion to Dismiss Relator-Plaintiff Michael Hockaday's Complaint (the "Motion to Dismiss Hockaday Complaint"), (ECF No. 53);[4] and,

    (3)    Defendants' Motion to Dismiss Relator-Plaintiff Sethina Fortunatè's Complaint (the "Motion to Dismiss Fortunatè Complaint"), (ECF No. 55).

The Government, Fortunatè, and Hockaday responded to each of the Motions to Dismiss, (ECF

Nos. 57–59), and the Defendants replied, (ECF Nos. 60–62).

These matters are ripe for adjudication. The Court dispenses with oral argument because

the materials before it adequately present the facts and legal contentions, and argument would

not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[5]

For the reasons that follow, the Court will deny the Motion to Dismiss Joint Complaint, deny the

Motion to Dismiss Fortunatè Complaint, and deny in part and grant in part the Motion to Dismiss

Hockaday Complaint.

---

short for qui tam pro domino rege quam pro se ipso in hac parte sequitor, which means who pursues this action on our Lord the King's behalf as well as his own." *Am. Civil Liberties Union v. Holder*, 673 F.3d 245, 248 n.1 (4th Cir. 2011) (internal quotation marks and citation omitted).

[3] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[4] As explained in the Motion to Dismiss Hockaday Complaint, Teshana D. Gipson was formerly known as Teshana D. Henderson. (Mot. Dismiss Joint Compl. 1 n.1, ECF No. 53.) The Court DIRECTS the Clerk to correct the docket to reflect the name change.

[5] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Government and the individual relators bring claims under the False Claims Act, 31 U.S.C. § 3730.

## I. Factual and Procedural Background

The Government, Fortunatè, and Hockaday assert claims under the False Claims Act

("FCA"),[6] Virginia Fraud Against Taxpayers Act ("VFATA"),[7] and various state law theories of

liability, alleging that Defendants presented fraudulent claims to the Government and retaliated

against employees who expressed reservations about Defendants' billing practices.

This action proceeds with three Complaints and three corresponding Motions to Dismiss.[8]

Because the Joint Complaint in Intervention supersedes certain claims that the individual

plaintiffs Sethina Fortunatè and Michael Hockaday alleged, the Court recounts the facts relevant

to the Government's allegations in the Joint Complaint before turning to the claims raised by

Fortunatè and Hockaday.[9]

---

[6] In relevant part, the False Claims Act provides that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b).  The Government brings claims under two subsections of the FCA, 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B).  Those subsections state that a person may be liable under the FCA if that person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or, "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B).

[7] In relevant part, the Virginia Fraud Against Taxpayers Act provides that "[a] person may bring a civil action for a violation of § 8.01-216.3 for the person and for the Commonwealth." Va. Code § 8.01-216.5(A).  The Government brings claims under two subsections of the VFATA, Va. Code § 8.01-216.3(A)(1) and (A)(2).  Those subsections provide that a person may be liable under the VFATA if that person "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or, "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Va. Code §§ 8.01-216.3(A)(1)–(2).

[8] The Parties have agreed to dismiss without prejudice Defendant Ellis Henderson. (ECF Nos. 32, 33.)  The Joint Complaint does not name Ellis Henderson as a Defendant, (Jt. Compl., ECF No. 25), but in the Hockaday Complaint and the Hockaday Amended Complaint Ellis appears as a named Defendant. (3:16cv767, ECF Nos. 1, 5).  Ellis Henderson was not served and has not otherwise appeared as a litigant in this dispute.  The Court will dismiss without prejudice Ellis Henderson.

[9] The Government elected to intervene following a three year investigation into the claims Fortunatè and Hockaday alleged. (Notice of Intervention, ECF No. 20.)  When the

**A.    Factual Background as to the Government's Claims Raised in the Joint Complaint in Intervention[10]**

The Government alleges that from January 1, 2013 through June 30, 2017, Defendants submitted or caused to be submitted false and fraudulent claims to the Virginia Department of Medical Assistance Services ("DMAS").  (Joint Compl. ¶ 43, ECF No. 25.)  The Government asserts that during this time, "Defendants knowingly billed DMAS for approximately one thousand six hundred and ninety-nine (1,699) claims for services for which they did not provide and/or did not support with legitimate documentation."  (*Id.* ¶ 46.)  The Government avers "[t]hese fraudulent claims represent approximately thirty percent (30%) of NDUTIME's paid medical crisis services claims during that time period."  (*Id.*)  The allegedly false or fraudulent claims are described in more detail below.

**1.    Virginia Medicaid Provider Requirements**

The Virginia Medicaid Program is a jointly funded federal and state program that provides health care coverage to eligible individuals.  (Joint Compl. ¶ 18 (citing 42 U.S.C. § 1396a(a)(10)(A)(i).)  DMAS operates as the only state agency to supervise the Medicaid Program on a statewide basis and does so in accordance with the federal regulations set forth in 42 C.F.R. § 431.50.  (*Id.* ¶ 20 (citing 12 Va. Admin. Code §§ 3–10–10, 3–10–30).)

---

Government elects to intervene in a *qui tam* action, its complaint may supersede claims brought in the initial relator complaint. *See United States ex rel. Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 269 (4th Cir. 2016) (recognizing that the "*qui tam* complaint was superseded by the government's Complaint in Intervention").  As explained below, the Joint Complaint supersedes several of Fortunatè and Hockaday's claims.

[10] For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

4

"NDUTIME has been a Virginia Medicaid provider since approximately September 1, 2006." (*Id.* ¶ 25.) To enroll in the Virginia Medicaid Program, a provider such as NDUTIME must first execute an agreement with DMAS. (*Id.* ¶ 24.) That agreement directs the provider to "adhere to the policies and regulations contained in the manuals pertaining to the specific services provided, including documentation requirements, necessary qualifications for staff, and rules for billing." (*Id.*) A provider also "agrees to comply with all applicable state and federal laws." (*Id.*)

NDUTIME bills DMAS for "Community Mental Health Rehabilitative Services." (*Id.* ¶ 11.) As a Community Mental Health Rehabilitative Services provider, NDUTIME must "document services through daily progress notes and times spent in the delivery of services." (*Id.* ¶ 27.) (citation omitted). In accordance with the Community Mental Health Rehabilitative Services Provider Manual (the "Manual"), "[p]rogress notes must include individual specific documentation that contains the unique differences particular to the recipient's circumstances, treatment, and progress." (*Id.* ¶ 28.) (citation omitted). The Manual requires providers and their staff to sign and contemporaneously date the progress notes. (*Id.* ¶ 28.) The progress notes "must corroborate the time spent and specifically document the service the provider rendered to support each of the units the provider billed." (*Id.* ¶ 29.) While providers must retain billing documentation for five years, such as progress notes, DMAS does not require providers to submit progress notes when submitting each claim. (*Id.* ¶ 30.)

    2.    **The Joint Complaint Describes Four Types of Mental Health Rehabilitative Services Relevant to the Alleged False or Fraudulent Claims**

As a Community Mental Health Rehabilitative Services Provider, NDUTIME:

(1) conducts service specific provider intakes; and provides (2) crisis intervention services;

(3) crisis stabilization services; and, (4) therapeutic day treatment services. (*Id.* ¶¶ 25–26, 33.) The Court addresses these four different services.

Regarding service specific provider intakes, Virginia Medicaid regulations require licensed mental health professionals, licensed mental health professional types, or a certified pre-screener to conduct a service specific provider intake in a face-to-face setting. (*Id.* ¶ 36.) The service specific provider intake gathers pertinent information about an individual, demonstrates the recipient's medical need, and defines the treatment plan. (*Id.* ¶¶ 37–38.)

Regarding crisis intervention services, "DMAS designed [these] services to provide immediate mental health care, available twenty-four (24) hours a day, seven (7) days per week, to assist recipients experiencing acute psychiatric dysfunctions that require immediate clinical attention." (*Id.* ¶ 39.) Crisis intervention services may include "office visits, home visits, preadmission screenings, telephone contacts, and other recipient-related activities needed to prevent the recipient from being hospitalized." (*Id.*) One billing unit of crisis intervention services equals fifteen minutes. (*Id.*)

In contrast to intervention services, "DMAS designed [crisis stabilization] services to stabilize the recipient and strengthen the recipient's current living situation so that the recipient remains in the community during and beyond the crisis period." (*Id.* ¶ 40.) Crisis stabilization services "provide temporary, intensive services that avert emergency, psychiatric hospitalization, or institutional placement of recipients who are experiencing serious psychiatric or behavioral problems that jeopardize their current community living situation." (*Id.*) One billing unit of crisis stabilization services equals one hour. (*Id.*)

Regarding therapeutic day treatment services, such services are designed "to assist youth and adolescents who are at risk of being removed from their homes due to mental health,

6

behavioral, or emotional issues resulting in significant functional impairment in major life activities." (*Id.* ¶ 42.)  Therapeutic day treatment providers must bill such services in units.  (*Id.*)  Providers must bill one unit for 2 to 2.99 hours of therapeutic day treatment services rendered, two units for 3 to 4.99 hours of services rendered, and three units for more than five hours of services rendered.  (*Id.*)

> **3.     In 2015, Virginia Revised its Medicaid Regulations Concerning Virginia Medicaid Mental Health Rehabilitative Services Providers <u>and Limited the Individuals Authorized to Provide Certain Services</u>**

In 2015, DMAS implemented changes to the Community Mental Health Rehabilitative Services Provider rules and regulations.  (*Id.* ¶ 33.)  Before January 30, 2015, DMAS allowed qualified mental health professionals who *did not hold licenses* to conduct service specific provider intakes and to provide crisis intervention services.  (*Id.*)  On January 30, 2015, DMAS changed its regulations to require that *licensed* mental health professionals and *licensed* mental heath professional types provide crisis intervention services.  (*Id.*)  Ten weeks later, on March 16, 2015, DMAS reiterated these changes to Community Mental Health Rehabilitative Services providers through a "Medicaid Memo."  (*Id.*)  Roughly three months later, on June 29, 2015, DMAS issued updated provider manual chapters that reflected the regulatory changes.  (*Id.* ¶ 36 n.4)

The Government avers that Defendants had knowledge of these regulatory changes before they took effect on January 30, 2015, but Defendants did not comply with the regulations.  (*Id.* ¶ 34.)  On January 29, 2015, the day before the regulatory changes became effective, NDUTIME's Clinical Director, Chatrice Thorne, commented on the Virginia Regulatory Town Hall website about the proposed rule change, which addressed changes to the licensure needed to provide crisis intervention services.  (*Id.*)  The regulations, as revised, changed licensure

7

requirements and did not allow qualified mental health professionals to provide crisis intervention services or conduct service specific provider intakes. (*Id.* ¶ 35.) The Government alleges that after January 30, 2015, Defendants repeatedly violated that regulation by having qualified mental health professionals conduct service specific provider intakes or provide crisis intervention services. (*Id.* ¶¶ 71–79, 83, 86, 88.) With this background about the 2015 regulatory changes in mind, the Court turns to the allegations of false and fraudulent claims as described in the Joint Complaint.

### 4. The Joint Complaint Alleges Defendants Submitted False and Fraudulent Claims to DMAS for Payment during a Four and a Half Year Period

The Government alleges that Defendants "obtained health care benefit payments to which they were not entitled by way of three primary schemes: (1) billing for [crisis intervention and crisis stabilization services] not provided or supported by required documentation; (2) billing for [crisis intervention] services provided by unlicensed counselors; and (3) billing for [crisis intervention, crisis stabilization services, and therapeutic day treatment services] provided subsequent to a [service specific provider intake] that were fraudulently completed or not completed at all." (Joint Compl. ¶ 43.) The Government further alleges that "Dr. Gipson was heavily involved in NDUTIME's fraudulent billing scheme" as she had "control over the day to day operations, including billing, especially with regarding to NDUTIME's crisis services program." (*Id.* ¶ 44.)

#### a. Billing for Services Without Required Documentation

The Government alleges that "Defendants knew that DMAS, through its regulations and provider manuals, required documentation to support claims for the [Community Mental Health Rehabilitative Services] at issue here." (*Id.* ¶ 49.) "In early 2013, DMAS audited NDUTIME

and, among other findings, cited it for lacking progress notes to support [crisis intervention] services for three recipients." (*Id.* ¶ 50.) Leadership at NDUTIME, including Dr. Gipson, responded to the results of the missing documentation identified in the audit. (*Id.*) The Government alleges that "[t]his response not only illustrates that the Defendants knew claims they submitted to DMAS must have the required documentation, it further discusses fabricating the missing progress notes to meet this requirement." (*Id.*)

### b. **Fraudulent Documentation for Maximum Billing**

The Government alleges that "Defendants implemented a scheme in which they billed DMAS for the maximum units allowable by law and without regard for the time actually spent providing services." (*Id.* ¶ 51.) For instance, Defendants "required counselors to document services for at least eight (8) hours a day while recipients were housed in hotel rooms," simply because "a recipient was housed in the hotel, not because the recipient actually received eight (8) or more hours of service." (*Id.* ¶ 54.) For example, in 2014 Defendants directed counselors to bill for the maximum daily amount that DMAS allowed for both crisis intervention and crisis stabilization services. (*Id.* (quoting 2014 agenda that stated "When you have a client in the hotel you have to bill 8 hours/32 units a day").)

In 2015, DMAS removed the eight hour daily limit for crisis stabilization services. (*Id.* ¶ 55.) The Government alleges that thereafter Defendants nearly doubled the number of hours that they required counselors to document for crisis stabilization services. (*Id.*) Exhibit 1 to the Joint Complaint lists the specific false claims currently known to the Government that NDUTIME submitted to DMAS from January 1, 2013 to June 30, 2017.[11] The Joint Complaint describes some of the documentation underlying these claims:

---

[11] Exhibit 1 to the Joint Complaint contains an Excel spreadsheet, listing numerous claims that NDUTIME submitted, all of which are filed under permanent seal to protect the

9

For example, in December 2016, a counselor submitted a note indicating she provided services from 2:30 to 5:30 PM. After reviewing the progress note, Dr. Gipson responded on December 29, 2016 to the counselor and the crisis services leadership group via email, stating, "Same with this timeframe . . . Fixed and printed . . . You are messing up the shift and billing!!! 8a4p/8a-5p and 4p-10p/5p-10p!!! Please don't change the structure of the billing!!!" *See* Exhibit 4. To abide by her directive regarding the timing of the shifts, Dr. Gipson falsified the note to indicate that the counselor provided services from 12 to 4 PM and sent it back to the counselor to finalize. Defendants ultimately billed ten (10) hours of CS for this recipient on this day: six (6) hours for the evening shift and four (4) hours attributable to the progress note that Dr. Gipson "fixed." This claim is included in Exhibit 1.

(*Id.* ¶ 56.)

On a separate occasion, the Government alleges that Defendants directed billing for

predefined amounts of time, irrespective of the actual time spent rendering services:

In 2017, the lead crisis counselor sent an email to all the crisis counselors, copying Dr. Gipson, stating: "All clients billing for day shift should be 8 hours unless they are in school, work, or they are MIA [sic] this applies to evening shift as well which will be 6 hours, even if the client leaves the premises after being rendered services applicable to their ISP hours should not change." *See* Exhibit 5. Defendants implemented this schedule with purpose as evidenced by the billing data which shows that Defendants routinely billed DMAS for upwards of fourteen (14) or even sixteen (16) hours of service per recipient per day.

(*Id.* ¶ 57.)

In October 2016, Dr. Gipson stated via email that a counselor should create progress

notes "even when the recipients were not physically present for the counselors to provide

services." (*Id.* ¶ 59.) Specifically, Dr. Gipson said that "[l]eaving to be with family is not a valid

reason to not bill [sic]; it is if they are at work or school." (*Id.*)

The Government further alleges that progress notes "routinely contained fraudulently

inflated hours/units." (*Id.* ¶ 60.) For example, the Government identified where a progress note

confidential medical information contained within that exhibit in accordance with the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d. (Dec. 13, 2019 Order, ECF No. 34.)

for a given recipient listed six hours of crisis stabilization services conducted from 4:00 p.m. to 10:00 p.m., but the notes for that claim state that the recipient "left the premises and had not returned by 8:00pm curfew . . . [the recipient] was not in room as of 10pm." (*Id.*)  In another instance, the Government describes how progress notes for a particular claim, dated January 20, 2017, reflected zero hours of service "because the recipient was not present, yet Defendants billed DMAS for services anyway." (*Id.* ¶ 61.)  "Dr. Gipson signed both progress notes to indicate that she was the supervisor and that she reviewed the notes." (*Id.*)  That claim resulted in Defendants receiving $1,246.00 from DMAS for services rendered. (*Id.*)

In the Joint Complaint, the Government describes other instances of alleged overinflated billing.  On another occasion, Dr. Gipson signed progress notes that stated three recipients had received crisis services for eight hours, even though the same notes indicated that the "recipients were absent for some, if not most," of the period in question. (*Id.* ¶ 63.)  The Joint Complaint does not detail all the documentation for the claims listed in Exhibit 1.

### c.    <u>Missing Required Documentation for Billing</u>

The Government alleges that while Defendants supported some of the claims with fraudulent documentation, "most of the fraudulent claims identified wholly lacked supporting documentation." (*Id.* ¶ 64.)  In the Joint Complaint the Government identified several claims that DMAS paid, despite lacking the requisite documentation:

> For example, a July 2014 Management Report for [crisis intervention] and [crisis stabilization] services indicated that certain recipient charts lacked progress notes from August 2013 and that NDUTIME needed to retract an April 2013 billing for another recipient in the amount of $615.80.  To date, Defendants never repaid the sum they received for this claim.

(*Id.* ¶¶ 65–66.)

The Government identifies ten more specific claims for crisis intervention and crisis stabilization services that lack documentation, and identifies these claims with the service date, the units billed, and the amount paid to Defendants. (*Id.* ¶ 66.) In so doing, the Government claims "Defendants knowingly or with reckless disregard submitted false claims that lacked required progress notes or that were supported by fraudulent documentation." (*Id.* ¶ 68.) The Government further asserts that, despite knowing that "DMAS requires accurate documentation to support each billed claim, Defendants engaged in a scheme that resulted in approximately [$1,361,174.58] of billing for claims for services that were either supported by fraudulent documentation or that were not provided, as evidenced by missing progress notes." (*Id.* ¶ 69.) The Government maintains that the fraudulent or unsupported claims are contained in Exhibit 1. (*Id.*)

### d.    Unlicensed Counselors Provided Crisis Intervention Services

The Government avers that from January 31, 2015, through May 26, 2016, Defendants knowingly billed DMAS for approximately 127 claims for crisis intervention services, which unlicensed and unqualified NDUTIME counselors provided. (*Id.* ¶ 71.) Two months after the January 31, 2015 regulatory change, on March 17, 2015, Dr. Gipson sent an email to the directors of NDUTIME to share a news article about another crisis intervention provider who had terminated employees due to the regulatory changes. (*Id.* ¶ 73.) In that email, Dr. Gipson stated: "We will need to revamp Crisis ASAP! They [non-licensed staff] will all be able to provide Stab, but not intervention." (*Id.*)

The Government claims that, despite the January 30, 2015 regulatory change, Defendants continued to bill DMAS for crisis intervention services provided by unlicensed staff through the end of May 2016. (*Id.* ¶¶ 73, 76.) For instance, the Government identified progress notes signed

by a qualified mental health professional showing that a Medicaid recipient received crisis intervention services, even though the qualified mental health professional was not authorized to render such services. (*Id.* ¶ 77.) As a result, DMAS paid Defendants approximately $77,436.85, as though licensed persons had provided the services. (*Id.* ¶ 78.)

      **e.**    **Fraudulent or Missing Service Specific Provider Intakes**

The Government further alleges that "[f]rom January 30, 2015, through January 2, 2017, Defendants knowingly billed DMAS for approximately [897] claims" even though such claims contained "missing and/or fraudulently conducted [service specific provider intakes or services] provided after the missing and/or fraudulently completed [service specific provider intakes]." (*Id.* ¶ 80.) The Government identified fifty-three instances in which qualified mental health professional-level, unlicensed counselors improperly conducted service specific provider intakes. (*Id.* ¶ 83.)

In the Joint Complaint, the Government describes NDUTIME's internal review process behind these claims in which unqualified individuals conducted the review before submitting claims to DMAS:

> This practice is evidenced by NDUTIME's internal review process, in which a QMHP physically conducted the [service specific provider intakes], drafted the SSPI, and emailed the SSPI as an attachment to "ClinicalReports@ndutime.org" for review. The clinical reviewer then notified the QMHP of any recommended changes and the QMHP made the edits prior to resubmitting the SSPI to be finalized. The finalized SSPI that NDUTIME filed in the recipient's chart reflected a license or license-type counselor's signature on a line representing the "Signature/Title of Person Completing Assessment," as though the licensed counselor had actually conducted the assessment. For example, in February 2015, a QMHP-level counselor submitted an email to NDUTIME's clinical reports email account. The counselor attached a document containing the recipient's initials followed by "crisis assessment." The finalized SSPI that NDUTIME filed in the

recipient's chart reflected Shalanda Jackson's signature, the crisis services supervisor, on the line representing the "Signature/Title of Person Completing Assessment."

(*Id.*)

The Government alleges that, despite knowing that unlicensed qualified mental health professional staff could not conduct service specific provider intakes, Defendants continued to utilize this process. (*Id.* ¶¶ 84–86.) Because the service specific provider intake "forms the basis for all subsequent treatment[,] Defendants improperly relied upon these fraudulent [service specific provider intakes] for treatment purposes." (*Id.* ¶ 86.)

The Government further asserts that Defendants "failed to conduct [service specific provider intakes] for approximately twenty-three (23) crisis services patients for whom they billed [crisis intervention and crisis stabilization] services." (*Id.* ¶ 88.) "Defendants knowingly submitted false claims for services totaling approximately [$583,390.60]." (*Id.*) Based on these allegations, the Government brings eight claims in the Joint Complaint, comprised of two federal False Claims Act claims and six state law claims. (*Id.* ¶¶ 90-131.)

### B.   Factual Background as to Sethina Fortunatè's Retaliation Claims

Fortunatè brings her Complaint pursuant to the False Claims Act, 31 U.S.C. §§ 3729 through 3733, and the Virginia Fraud Against Taxpayers Act, Virginia Code §§ 8.01-216.1 through 8.01-216.19. (Fortunatè Compl., 3:16cv653, ECF No. 1.) The Court provides the relevant factual background for Fortunatè's federal and state retaliation claims.

Fortunatè filed her Complaint on August 8, 2016. (*Id.*) In her Complaint, Fortunatè avers that she worked at NDUTIME from May 6, 2013, until her termination from the company three months later, on August 9, 2013. (*Id.* 4.) Fortunatè worked as a Mental Health Crisis Counselor, with a Qualified Mental Health Professional designation. (*Id.* ¶ 18.) "Fortunatè's job

duties included providing face-to-face crisis intervention and stabilization services to clients of
NDUTIME, conducting mental health assessments, developing and implementing treatment
plans, providing direct therapeutic treatment/counseling services, and completing documentation
related to same." (*Id.* ¶ 19.) Fortunatè alleges that "[d]uring her brief employment with
NDUTIME, [she] was a dedicated employee who performed her job competently and
effectively." (*Id.* ¶ 20.)

While working for NDUTIME, "Fortunatè discovered numerous issues concerning
billing practices that were not compliant with federal and state regulations mandated by
NDUTIME's participation in the Medicaid reimbursement program." (*Id.* ¶ 21.) Fortunatè avers
that she "addressed her concerns with NDUTIME management and opposed her employer's
conduct of knowingly presenting false submissions to, and creating and using false statements
and records" to receive payment from, the United States and Virginia. (*Id.* ¶ 22.) Fortunatè
claims that when she "voiced her opposition to NDUTIME's fraudulent billing practices and
refused to participate in the wrongful billing, NDUTIME terminated her employment in
retaliation for that opposition, in violation of federal and state law." (*Id.* ¶ 23.)

Specifically, Fortunatè alleges that she "repeatedly raised questions with management,"
including with her clinical field supervisor and the billing department, "as well as with co-
workers, regarding the fraudulent and unethical practices she observed and/or in which she was
instructed to engage." (*Id.* ¶ 48.) On August 9, 2013, Fortunatè again told her clinical field
supervisor "that she did not feel comfortable with and opposed NDUTIME's billing practice."
(*Id.* ¶ 51.) "That same day, she was called into a meeting . . . and told that her employment was
terminated purportedly for missing a doctor's meeting with a client (that she had in fact attended)

15

and [for] 'violation of policies and falsifying clinical time keeping records' – the very issues she

had been raising with NDUTIME management over the past month." (*Id.*)

After being terminated, NDUTIME informed Fortunatè that "she would not be paid for

some of the work she performed prior to her separation because she had not yet completed

certain documentation for clients." (*Id.* ¶ 52.)  Fortunatè claims she "refused to complete client

documentation that she believed" NDUTIME would revise to "inaccurately state the time spent

providing covered services and to support NDUTIME's fraudulent claims for reimbursement."

(*Id.* ¶ 53.)

Based on these allegations, Fortunatè brings one retaliation claim pursuant to the False

Claims Act and one retaliation claim pursuant to the Virginia Fraud Against Taxpayers Act.[12]

**C.     Factual Background as to Michael Hockaday's Retaliation Claim**

Hockaday brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729 through

3733, and the Virginia Fraud Against Taxpayers Act, Virginia Code §§ 8.01-216.1 through 8.01-

216.19. (Hockaday Compl., 3:16cv767, ECF No. 5.)  The Court provides the relevant factual

background for Hockaday's False Claims Act retaliation claim.[13]

Hockaday filed his initial complaint on September 15, 2016, roughly one month after

Fortunatè , and his operative Amended Complaint on December 21, 2016.  (3:16cv767, ECF

Nos. 1, 5).  Although Hockaday did not include a retaliation claim in his initial complaint, he did

---

[12] Fortunatè concedes that the Joint Complaint in Intervention supersedes her other FCA and VFATA claims.  In response to the Motion to Dismiss, Fortunatè "withdraws Counts I and II of her Complaint because they have been superseded by the Government's Complaint in Intervention." (Resp. Mot. Dismiss 5, ECF No. 58.)

[13] Although Hockaday contends that the Joint Complaint in Intervention does not supersede his claims brought under the False Claims Act and the Virginia Fraud Against Taxpayers Act, the Court finds that his arguments lack merit.  The Court discusses in more detail below why the Joint Complaint in Intervention supersedes certain claims in Hockaday's Complaint.

so when he amended his Complaint three months later. (*Id.*) In his Amended Complaint, Hockaday explains that he worked at NDUTIME from 2014 until his resignation on December 19, 2016. (Hockaday Compl. ¶¶ 8, 184, 3:16cv767, ECF No. 5.) Hockaday worked as a crisis counselor before being promoted in July 2014 to lead crisis counselor. (*Id.* ¶¶ 30–32.) Hockaday held credentials as a qualified mental health professional. (*Id.* ¶ 28.)

Hockaday states that while working at NDUTIME, Teshana Gipson, the Chief Administrative Officer and Chief Operating Officer, was his "direct supervisor." (*Id.* ¶ 33.) Hockaday avers Dr. Gipson was "directly and heavily involved in the day-to-day operations of NDUTIME."[14] (*Id.* ¶ 24.)

Hockaday alleges that he raised billing concerns to Gipson during his tenure at NDUTIME. (*Id.* ¶ 116.) For instance, on June 5, 2016, Hockaday asked Gipson how to bill for crisis intervention and crisis stabilization services when "counselors do not have any direct interactions with the individual who is supposed to be receiving services when counselors are not at work." (*Id.*) Hockaday also includes in his Amended Complaint a copy of an email dated June 6, 2016, that he sent to Gipson and Shalanda Jackson, the crisis services supervisor, which documents some of his billing concerns. (*Id.* 33.) On another occasion, Hockaday determined that a person "no longer met the criteria to continue receiving services, and he emailed Jackson and [Gipson] explaining" his position. (*Id.* ¶ 134.) In response, Dr. Gipson instructed Hockaday to continue services and transition that person "to crisis intervention for one (1) day and then to readmit [that individual] to crisis stabilization," even though Hockaday asserted that the criteria were not met for either service. (*Id.* ¶ 134.)

---

[14] As explained in the Motion to Dismiss Hockaday Complaint, Teshana D. Gipson was formerly known as Teshana D. Henderson. (Mot. Dismiss Joint Compl. 1 n.1, ECF No. 53.)

Hockaday alleges that "[o]n or around December 1, 2016, [he] emailed . . . [Gipson] stating that he would no longer conduct specific provider intakes, backdate specific provider intake forms, or otherwise engage in practices that Hockaday felt were violations of the law, regardless of whether . . . [Gipson] specifically ordered Hockaday to do so." (*Id.* ¶ 153.) Hockaday avers his email explained "that he could no longer condone NDUTIME's overbilling of clients and assigning counselors to treat and bill for multiple clients in a single day." (*Id.* ¶ 154.) In response, NDUTIME diminished his job duties and threatened him with termination. (*Id.* ¶ 155.) On December 19, 2016, "Hockaday resigned from NDUTIME due to ongoing retaliation and NDUTIME's continuing demands that Hockaday participate in the fraud against the United States and Commonwealth of Virginia." (*Id.* ¶ 156.) Hockaday alleges that the "[t]emporal proximity between Hockaday's disclosures and NDUTIME's decision to reduce Hockaday's job duties and threaten him with termination is strongly suggestive of causation" for his retaliation claim. (*Id.* ¶ 185.)

### D.    Procedural Background

The Court next recites the specific claims raised and remedies requested in each of the three Complaints.

### 1.    The Government Alleges Eight Claims in the Joint Complaint

The Government brings eight claims in its Joint Complaint in Intervention, comprised of two claims arising under federal law and six claims under state law: (1) presenting false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) (Count I); (2) making or using a false or fraudulent record or statement in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B) (Count II); (3) submitting false or fraudulent claims in violation of the VFATA, Va. Code § 8.01-216.3(A)(1) (Count III); (4) submitting false or fraudulent claims in violation of

18

the VFATA, Va. Code § 8.01-216.3(A)(2) (Count IV); (5) violations of the Virginia Medicaid

Fraud Statute, Va. Code § 32.1-312[15] (Count V); (6) payment by mistake under Virginia law

(Count VI); (7) common law fraud under Virginia law (Count VII); and, (8) unjust enrichment

under Virginia law (Count VIII).  (Joint Compl. ¶¶ 90–131.)

     The Joint Complaint seeks to "recover three-fold the damages determined to have been

sustained by them" pursuant to 31 U.S.C. § 3729(a) and Virginia Code § 8.01-216.3, and request

that judgment be entered against Defendants jointly and severally in favor of the Government.

(Joint Compl. ¶ 133.)  The Government further seeks "[t]hat Defendants be ordered to pay civil

penalties . . . for each false claim filed; [and t]hat Defendants be ordered to pay the amount of

excess payments made by the Commonwealth as a result of Defendants' violation of the Virginia

Medicaid Fraud Statute plus interest at the rate of 1.5 percent each month for the period from the

date upon which payment was made to the date upon which repayment is made to the

---

[15] In relevant part, the Virginia Medicaid Fraud Statute provides:

> A. No person, agency or institution, but not including an individual medical assistance recipient of health care, on behalf of himself or others, whether under a contract or otherwise, shall obtain or attempt to obtain benefits or payments where the Commonwealth directly or indirectly provides any portion of the benefits or payments pursuant to the Plan for Medical Assistance and any amendments thereto as provided for in § 32.1-325, hereafter referred to as "medical assistance" in a greater amount than that to which entitled by:
>
>> 1. Knowingly and willfully making or causing to be made any false statement or false representation of material fact;
>> 2. Knowingly and willfully concealing or causing to be concealed any material facts; or
>> 3. Knowingly and willfully engaging in any fraudulent scheme or device, including, but not limited to, submitting a claim for services, drugs, supplies or equipment that were unfurnished or were of a lower quality, or a substitution or misrepresentation of items billed.

Va. Code § 32.1-312.

Commonwealth" pursuant to Virginia Code § 32.1-312(B), in addition to costs, compensatory damages, and "such other and further relief as the Court deems just, equitable and proper." (Joint Compl. ¶¶ 135–36, 138, 140.)

### 2.   Fortunatè Brings Two Retaliation Claims in her Complaint

Fortunatè brings two retaliation claims in her Complaint, one under federal law and one under state law.[16]  For her federal FCA retaliation claim, Fortunatè alleges that Defendants unlawfully retaliated against her, in violation of 31 U.S.C. § 3730(h),[17] "for her opposition to

---

[16] In response to the Motion to Dismiss, Fortunatè "withdraws Counts I and II of her Complaint because they have been superseded by the Government's Complaint in Intervention." (Resp. 5, ECF No. 58.) Those two counts addressed: (1) "Fraudulent Claims in Violation of 31 U.S.C. § 3729, *et seq*.;" and, (2) "Fraudulent Claims in Violation of Code of Virginia § 8.01-216.1, *et seq*." (Fortunatè Compl. 12–13.)

[17] That subsection provides:

(h) Relief from retaliatory actions.—

> (1) In general.--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.
> (2) Relief.--Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.
> (3) Limitation on bringing civil action.--A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred.

31 U.S.C. § 3730(h).

practices made unlawful by 31 U.S.C. § 3729 by terminating her employment and by withholding wages when she internally reported and voiced opposition to, in an effort to stop, fraud committed against the federal and state governments by NDUTIME." (Fortunatè Compl. ¶ 67.) As to her state VFATA retaliation claim, Fortunatè similarly alleges that NDUTIME retaliated against her "for her opposition to practices made unlawful by Va. Code § 8.01-216.3 by terminating her employment and by withholding wages when she internally reported and voiced opposition to, in an effort to stop, fraud committed against the federal and state governments by NDUTIME." (*Id.* ¶ 70.) Fortunatè seeks back pay and "compensation for special damages" for her retaliation claims. (*Id.* 16.)

### 3. Hockaday Brings Five Claims in his Complaint, Four of Which the Joint Complaint Supersedes

Hockaday brings one claim of retaliation pursuant to the False Claims Act, 31 U.S.C. § 3730(h). (Hockaday Compl. ¶¶ 179–86, 3:16cv767, ECF No. 5.) In addition to his retaliation claim, Hockaday brings four other claims in his Complaint: (1) violations of Virginia Code § 8.01-216.3(A)(1) for presenting false claims to Virginia Medicaid for payment; (2) violations of Virginia Code § 8.01-216.3(A)(2) for making or causing a false record to be made in support of claims made to Virginia Medicaid for payment; (3) violations of 31 U.S.C. § 3729(a)(1)(A) for presenting false claims to Virginia Medicaid for payment; and, (4) violations of 31 U.S.C. § 3729(a)(1)(B) for making, using, or causing a false record or material statement to be made or used in support of a false claim to Virginia Medicaid for payment. (Hockaday Compl. 38–42.)

#### a. The Joint Complaint Supersedes Four of Hockaday's Claims

The Court concludes that the Joint Complaint has superseded Hockaday's federal FCA claims and state VFATA claims because those claims are duplicative and repetitious.[18] The FCA

---

[18] The table below lists the duplicative claims:

states that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States government." 31 U.S.C. § 3730(b)(1). When the Government decides to intervene in a *qui tam* action, however, the Government's claims become operative insofar as they are duplicative or repetitious of the claims brought by the relator.[19] "[B]y automatic

---

| Joint Complaint | Hockaday Complaint |
|---|---|
| **Count Three:** submitting false or fraudulent claims in violation of the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.3(A)(1) | **Count One:** violations of Va. Code § 8.01-216.3(A)(1) for presenting false claims to Virginia Medicaid for payment |
| **Count Four:** submitting false or fraudulent claims in violation of the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.3(A)(2) | **Count Two:** violations of Va. Code § 8.01-216.3(A)(2) for making or causing a false record to be made in support of claims made to Virginia Medicaid for payment |
| **Count One:** presenting false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) | **Count Three:** violations of 31 U.S.C. § 3729(a)(1)(A) for presenting false claims to Virginia Medicaid for payment |
| **Count Two:** making or using a false or fraudulent record or statement in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) | **Count Four:** violations of 31 U.S.C. § 3729(a)(1)(B) for making, using, or causing a false record or material statement to be made or used in support of a false claim to Virginia Medicaid for payment |

[19] Section 3730 does not require the government—on intervention—to pursue all the relator's claims. As then-Judge Samuel Alito wrote for the United States Court of Appeals for the Third Circuit:

> When a *qui tam* action is filed, the government may "proceed with *the action*," §§ 3730(b)(2) and (4) (emphasis added) or "decline to take over *the action*," § 3730(b)(4)(B) (emphasis added), but the government often decides to take over only certain claims in a multi-claim action, and we are aware of no decision holding that this is improper.

*United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000) (emphasis in original).

Indeed, the government need not intervene at all, and the relator can prosecute the case with counsel. 31 U.S.C. § 3730(b)(4)(B); *see also Wojcicki v. SCANA/SCE&G*, 947 F.3d 240, 246 (4th Cir. 2020) (concluding that a relator cannot bring a *pro se* FCA *qui tam* action because the relator proceeds on behalf of the government). The statute and case law thus contemplate that the government can pursue some or all the relator's claims, and the relator can pursue claims when the government does not.

operation of the statute the Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened." *United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014) (citation omitted).

Relators, however, continue to play a role in the *qui tam* action after the government intervenes, albeit in a more limited capacity. The FCA dictates that "[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action." 31 U.S.C. § 3730(c)(1). The United States Court of Appeals for the Fourth Circuit has further recognized the statutorily-limited role of relators:

> The United States may seek to curb a *qui tam* relator's participation if such participation is repetitious, irrelevant, or harassing. *See id.* § 3730(c)(2)(C). Likewise, the United States may seek to curb civil discovery in a *qui tam* action if such discovery will interfere with ongoing civil or criminal investigation arising from the same facts. *Id.* § 3730(c)(4). Moreover, a defendant may seek to limit a *qui tam* relator's participation in the litigation. *See id.* § 3730(c)(2)(D).

*Am. Civil Liberties Union*, 673 F.3d at 250–51.

Here, Hockaday's federal FCA claims and state VFATA claims are duplicative and repetitious of the claims that the Government brings in its Joint Complaint in Intervention. Defendants also seek to limit Hockaday's participation in the litigation by requesting dismissal of his duplicative claims. *See* 31 U.S.C. § 3730(c)(2)(D). Because the Joint Complaint in Intervention supersedes Hockaday's Complaint with respect to the intervened claims, and because Hockaday and Fortunatè have the right to continue as parties to this action and pursue their individual retaliation claims, the Court will grant Defendants' Motion to Dismiss Hockaday's claims, given that they are duplicative of the Government's claims.

---

But here, the Government intervened on the specific claims that Hockaday, represented by counsel, brought in his Complaint, and Defendants have sought to dismiss them as duplicative.

### b.   The Joint Complaint Does Not Supersede Hockaday's Retaliation Claim

Hockaday may maintain his retaliation claim because the Joint Complaint in Intervention does not supersede it.  For his federal retaliation claim, Hockaday alleges that Defendants violated 31 U.S.C. § 3730(h) when they "retaliated against Hockaday by threatening him with termination and dismissing [sic] his job duties" after he "emailed . . . [Gipson] stating that he refused to continue completing and/or backdating specific provider intakes and confronted [her] about NDUTIME's overbilling practices." (Hockaday Compl. 47.)  Hockaday seeks damages, back pay, and "compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees." (*Id.*)

### 4.   Defendants Move to Dismiss All Three Complaints for Failure to Meet the Requisite Pleading Standards

In response to these three Complaints, Defendants filed the instant Motions to Dismiss, seeking to dismiss all counts brought against them for failing to state a claim.  Defendants assert that the Government did not meet the applicable pleading standards for the fraud claims, and that the Government cannot plead equitable causes of action and legal causes of action in the alternative because "[t]he existence of an express contract between NDUTIME and Medicaid precludes the government from pursuing" such remedies.  (Mem. Supp. Mot. Dismiss Joint Compl. 5–12, ECF No. 52.)  Defendants similarly assert that Fortunatè and Hockaday did not meet the applicable pleading standards for their retaliation claims.  The Government, Fortunatè, and Hockaday responded and Defendants replied.  The Court next addresses the merits of the pending Motions to Dismiss.

## II. Standards of Review: Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 678–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of

the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)).  This principle applies only to

factual allegations, however, and "a court considering a motion to dismiss can choose to begin

by identifying pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth." *Iqbal*, 556 U.S. at 679.

When pursuing a fraud claim, a plaintiff "must state with particularity the circumstances

constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's

mind may be alleged generally." Fed. R. Civ. P. 9(b).  Like other types of fraud allegations,

fraud claims brought under the False Claims Act "must be pleaded with particularity pursuant to

Rule 9(b) of the Federal Rules of Civil Procedure."[20] *U.S. ex rel. Nathan v. Takeda Pharm. N.*

*Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013).

"To satisfy Rule 9(b), a plaintiff asserting a claim under the [FCA] 'must, at a minimum,

describe the time, place, and contents of the false representations, as well as the identity of the

person making the misrepresentation and what he [or she] obtained thereby.'" *Id.* at 455–56

(quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir.

2008)).  Because the FCA and the VFATA contain similar provisions, federal courts in Virginia

apply the same pleading standard to VFATA claims. *See United States ex rel Orgnon v. Chang*,

No. 3:13cv144, 2016 WL 715746, at *1 n.2 (E.D. Va. Feb. 19, 2016) (citation omitted).

In contrast, retaliation claims need only meet the requirements of Federal Rule of Civil

Procedure 8.  As the Fourth Circuit has explained,

> [T]he False Claims Act's whistleblower provision, which Congress broadened in
> 2009, prohibits retaliation "because of lawful acts done. . . in furtherance of an
> action under this section or other efforts to stop 1 or more violations of this

---

[20] As a general rule, courts "should hesitate to dismiss a complaint under Rule 9(b) if the
court is satisfied (1) that the defendant has been made aware of the particular circumstances for
which she will have to prepare a defense at trial, and (2) that plaintiff has substantial
prediscovery evidence of those facts." *United States ex rel. Bunk v. Gov't Logistics N.V.*, 842
F.3d 261, 275 (4th Cir. 2016).

subchapter." 31 U.S.C. § 3730(h).  To plead retaliation under Section 3730(h), a plaintiff must allege that (1) he [or she] engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against him [or her] as a result.  These allegations need pass only Civil Procedure Rule 8(a)'s relatively low notice-pleadings muster—in contrast to Rule 9(b)'s specificity requirements discussed above.

*Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (internal citations and alterations omitted).

## III.  Analysis

The Court first determines whether the Government's fraud claims, (the alleged violations of the FCA, VFATA, the Virginia Medicaid Fraud Statute, and common law fraud), meet the specificity requirements of Federal Rule of Civil Procedure 9 in a manner sufficient to withstand Defendants' Motion to Dismiss.  Second, the Court examines whether the Government may maintain its equitable and legal causes of action in the alternative.  Finally, the Court considers whether the individual relator retaliation claims meet the pleading requirements to overcome Defendants' Motions to Dismiss.  The Court answers all inquiries in the affirmative.

### A.      The Government's FCA and VFATA Claims Meet the Specificity Requirements Set Forth in Rule 9

In the Motion to Dismiss the Joint Complaint, Defendants argue that the Government brings only "conclusory allegations and recitations of law, regulation, and Medicaid [M]anual provisions." (Mem. Supp. Mot. Dismiss Joint Compl. 5.) "In the few instances where specific conduct is alleged, the allegations are often isolated to specific knowledge of a regulation or a change in that regulation's requirement." (*Id.* 5–6.) As a result, Defendants assert that the Government's fraud claims (Counts I, II, III, IV, V, and VII) should be dismissed because these pleading deficiencies do not satisfy the requirements of Federal Rule of Civil Procedure 9. (*Id.* 11.) These arguments do not prevail.

27

## 1.    Legal Standard:  FCA and VFATA Claims

The FCA includes four elements, all of which the Government must sufficiently plead for each defendant to properly state a claim.  31 U.S.C. § 3729(a)(1); *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999).  To state an FCA claim, the Government must show that: "(1) [t]here was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money." *Harrison*, 176 F.3d at 788.  Rule 9(b), as applied to the FCA, requires the relators to plead each element "with particularity," with the exception of the scienter element, which the relators may "allege[ ] generally." Fed. R. Civ. P. 9(b).  Thus, "Rule 9(b) requires that the complaint provide some indicia of reliability to support the allegation that an actual false claim was presented to the government." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 197 (4th Cir. 2018) (internal quotation marks and citations omitted).

Two ways to adequately plead "presentment" of a false claim under Rule 9(b) exist. First, to satisfy Rule 9(b), a plaintiff asserting a claim under the FCA "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Takeda Pharm. N. Am.*, 707 F.3d at 455–56.  Second, a plaintiff can allege a pattern of conduct that would "necessarily have led[ ] to submission of false claims" to the government for payment. *United Airlines Inc.*, 912 F.3d at 197.

The VFATA follows the same pleading standard as the FCA.  As the Supreme Court of Virginia has explained, "[t]he VFATA is based on the federal civil False Claims Act (FCA), 31 U.S.C. §§ 3729–3733." *Lewis v. City of Alexandria*, 756 S.E.2d 465, 469 (Va. 2014).  Because the FCA and the VFATA contain similar provisions, federal courts in Virginia apply the same

28

standard to VFATA claims. *United States ex rel Orgnon*, 2016 WL 715746, at *1 n.2. The Virginia Medicaid Fraud statute similarly prohibits the fraudulent obtaining of payments "where the Commonwealth directly or indirectly provides any portion of the benefits or payment pursuant to the Plan for Medical Assistance." Va. Code. § 32.1-312(A).

### 2.    The Government Alleges All Four Elements of the FCA and VFATA Sufficient to Survive the Motion to Dismiss the Joint Complaint

Here, the Government alleges all elements of the FCA and VFATA with particularity for their claims against Defendants, and generally alleges scienter in a manner sufficient to withstand the Motion to Dismiss Joint Complaint.[21]

As to the first element, a false or fraudulent statement of conduct, the Government states with particularity the facts of the fraudulent conduct that NDUTIME and Gipson allegedly committed. *See* 31 U.S.C. § 3729(a)(1); Fed. R. Civ. P. 9(b); *Harrison*, 176 F.3d at 784.  For instance, the Government alleges that Defendants "obtained health care benefit payments to which they were not entitled by way of three primary schemes: (1) billing for [crisis intervention and crisis stabilization services] not provided or supported by required documentation; (2) billing for [crisis intervention] services provided by unlicensed counselors; and (3) billing for [crisis intervention, crisis stabilization services, and therapeutic day treatment services] provided subsequent to a [service specific provider intake] that were fraudulently completed or not completed at all." (Joint Compl. ¶ 43.)  The Government provides representative examples for each type of fraudulently submitted claim, including the specific dollar amount that the Government paid for the alleged fraudulent claims, the paperwork underlying the alleged

---

[21] This is not to say that Defendants have committed a violation of the FCA or VFATA. Rather, assuming the truth of the allegations, as the Court must at this procedural posture, the Joint Complaint survives the Defendants' Motion to Dismiss because the Government's allegations satisfy the requirements of Rule 9.

fraudulent claims, and the relevant omissions or misstatements in that paperwork.  The Government also identifies the relevant lack of qualifications of the individuals completing the paperwork for the claims.  The Government attaches sixteen exhibits, provides a list of potentially false claims, references quotes in emails and other materials, identifies specific noncompliant progress notes, and includes dollar amounts to support its fraud allegations.  These detailed allegations and supporting documentation satisfy the first prong of an FCA and VFATA claim.

As for the second element, requisite scienter, the Government generally alleges that Defendants acted with deliberate ignorance or reckless disregard of their continued fraudulent conduct, (*see id.* ¶¶ 68, 91, 97, 98, 102, 120), after (1) a January 2015 regulatory change; (2) a prior audit that identified missing documentation; and, (3) multiple internal complaints from employees about overbilling or inconsistent documentation for claims.  The Government also alleges that Defendants had actual knowledge of legal requirements, including important regulatory changes and specific instances of fraudulent conduct that violated those regulations. *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2001 (2016) ("A defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment.")  Although Defendants argue that any of the alleged fraudulent claims "could have slipped through the cracks," meaning that they were "innocent mistakes" or "somehow the result of negligence," (Mem. Supp. Mot. Dismiss Joint Compl. 8, ECF No. 52), the claims allege scienter to survive the motion to dismiss.  The Government, therefore, has sufficiently pleaded that Defendants acted with deliberate ignorance or in reckless disregard of the FCA and VFATA.

30

As for the third element, materiality, the facts pleaded in the Joint Complaint illustrate that the conduct materially contributed to the Government's decision to reimburse the fraudulent claims. *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (when discussing the implied false certification theory, explaining that "a material falsehood was one that was capable of influencing the Government's decision to pay"); *see also Universal Health*, 136 S. Ct. at 2003 ("when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive") (also addressing implied false certification theory). In evaluating materiality in the FCA context, the Supreme Court of the United States has explained that the FCA statute itself defines materiality as having "a natural tendency to influence, or be[ing] capable of influencing, the payment or receipt of money or property." [22] *Id.* (citing 31 U.S.C. § 3729(b)(4)). At this

---

[22] In *Universal Health*, the Supreme Court resolved a circuit split on whether and to what extent the implied false certification theory is valid under the FCA.

A complaint raising FCA claims can allege express or implied false certification. Under the implied certification theory, liability attaches where "the claim does not merely request payment, but also makes specific representations about the goods or services provided;" and "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health*, 136 S. Ct. at 2001. Relators may satisfy the element of falsity by plausibly averring that the defendant "impliedly certifies compliance with all conditions of payment" when the defendant fails to disclose a "violation of a material statutory, regulatory, or contractual requirement." *Id.* at 1995. Thus, an entity can be liable under the FCA "when [it] submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.*

In addition, the Supreme Court held that liability "does not turn upon whether those requirements were expressly designated as conditions of payment" because "[w]hat matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* at 1996. Abuse of the theory, the Supreme Court cautioned, should be cabined by the "rigorous materiality requirement." *Id.*

The Supreme Court next fleshed out how to apply the "demanding" materiality standard. *Id.* at 2003. As the Supreme Court summarized:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual

stage, taking the allegations as true, the Court finds that the Joint Complaint sufficiently alleges

materiality because anyone reviewing NDUTIME's invoices "would probably—but wrongly—

conclude that [NDUTIME] had complied with core [contract] requirements," *id.* at 2000, thus

influencing the Government to make certain payments.  This satisfies the third element of an

FCA and VFATA claim.

As to the fourth element, causation, the representative examples that the Government

included in their Joint Complaint connect the fraudulent conduct to the false claims that

NDUTIME submitted, satisfying this last element.  *Takeda Pharms. N. Am., Inc.*, 707 F.3d at

456 (discussing how FCA claim elements require alleging that "a specific false claim was

presented to the government for payment").  The Government identifies several alleged false or

fraudulent claims that Defendants presented to DMAS for payment and the amount of monies

Defendants received in return, satisfying the requirement to adequately plead presentment under

Rule 9(b).[23]

Having satisfied the pleading requirement for all four elements of the FCA and VFATA

in accordance with Federal Rule of Civil Procedure 9, the Government has pleaded sufficient

facts to withstand Defendants' Motion to Dismiss as to the FCA and VFATA claims.

---

requirement as a condition of payment.  Nor is it sufficient for a finding of
materiality that the Government would have the option to decline to pay if it knew
of the defendant's noncompliance.  Materiality, in addition, cannot be found where
noncompliance is minor or insubstantial.

*Id.*

[23] For the same reasons, the Government has alleged a violation of the Virginia Medicaid
Fraud statute, which similarly prohibits the fraudulent obtaining of "payments where the
Commonwealth directly or indirectly provides any portion of the . . . payments."  Va. Code.
§ 32.1-312(A).  The Joint Complaint allows for the plausible inference that Defendants
fraudulently obtained Medicaid payments in violation of Virginia Code § 32.1-312(A).

### 3.   The Government Sufficiently Alleges Common Law Fraud

Defendants further assert that the Government does not satisfy the requirements of

Federal Rule of Civil Procedure 9 necessary to bring a common law fraud claim.  "Under

Virginia law, a plaintiff seeking to recover for fraud must allege: (1) a false representation, (2) of

a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by

the party misled, and (6) resulting damage to the party misled."  *Glaser v. Enzo Biochem, Inc.*,

464 F.3d 474, 476–77 (4th Cir. 2006).  "In Virginia, a claim of fraud does not require direct

contact or privity between the defendant and the plaintiff."  *Alexander v. Se. Wholesale Corp.*,

978 F. Supp. 2d 615, 623 (E.D. Va. 2013) (citing *Mortarino v. Consultant Eng'g Servs.*, 467

S.E.2d 778 (Va. 1996)).  A complaint must merely allege that the defendant knew or had reason

to know that the plaintiff would rely on the misrepresentation.  *Id.*

For the same reasons stated above for the FCA and VFATA claims, the Court finds that

the Joint Complaint alleges a common law fraud claim sufficient to survive the Motion to

Dismiss.  As previously mentioned, the Joint Complaint alleges with particularity when and how

Defendants made false representations of material fact when submitting claims for payment; that

Defendants did so despite knowing the regulatory requirements; and that Defendants made these

false representations with the intent to mislead DMAS, which resulted in Defendants receiving

payment from DMAS.  Although the Court finds this claim adequately pled for Rule 9(b)

purposes, the Court recognizes that this common law fraud claim might ultimately be unavailable

if the alleged misrepresentations—that is, the omissions or fraudulent claims submitted to

DMAS—took place pursuant to Defendants' contractual duties, a situation that ordinarily

forecloses a fraud claim.  *See Jones v. Bank of Am. Corp.*, No. 4:09cv162, 2010 WL 6605789, at

*8 (E.D. Va. Aug. 24, 2010) (holding that an action for fraud requires that the "alleged

misrepresentation was unrelated to [ ] performance" under a contract).  On this limited record

and without confirmation of an express contract, the Court will deny Defendants' Motion to

Dismiss as to the common law fraud claim.

As a result, the Court will deny Defendants' Motion to Dismiss the FCA, VFATA,

Virginia Medicaid Fraud, and common law fraud claims brought in the Joint Complaint in

Intervention (Counts I, II, III, IV, V, and VII).

### B.    At this Procedural Posture, the Government May Pursue its Payment By Mistake and Unjust Enrichment Claims

Defendants seek to dismiss the equitable causes of action—payment by mistake (Count

VI); and unjust enrichment (Count VIII)—brought in the Joint Complaint.  Payment by mistake

and unjust enrichment are traditionally considered equitable claims.  *See U.S. ex rel. Taxpayers*

*Against Fraud v. Singer Co.*, 889 F.2d 1327, 1330 n.15 (4th Cir. 1989).  Equitable claims "may

not be brought in the face of an express contract."[24]  *Acorn Structures, Inc. v. Swantz*, 846 F.2d

923, 926 (4th Cir. 1988) (evaluating unjust enrichment clam); *Butts,* 2013 WL 6039040 at *3

("A condition precedent to the assertion of such a claim is that no express contract exists

between the parties.").  Defendants contend that "[t]he existence of an express contract between

NDUTIME and Medicaid precludes the [G]overnment from pursuing equitable remedies."

(Mem. Supp. Mot. Dismiss Joint Compl. 12.)  As a result, Defendants assert that the Government

may not pursue its payment by mistake or unjust enrichment claims in the face of an express

contract and the Court should grant the Motion to Dismiss as to those claims.  (*Id.* 11–12.)  At

---

[24] The Court considers the payment by mistake and unjust enrichment claims equitable, rather than legal, in nature.  *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d at 1330 n.15 (noting that remedy of restitution in claims for unjust enrichment and payment under mistake of fact is equitable in nature); *see also Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991) ("[A] money damages award may be a form of equitable relief if it is restitutionary").

this procedural posture, the Court will deny the Motion to Dismiss Joint Complaint as to these two claims.

### 1.    Legal Standard:  Payment By Mistake

"In Virginia, the courts have long recognized the right to recover money paid by mistake of fact." *Liberty Mut. v. Williams Int'l Indus., Inc.*, 780 F. Supp. 359, 363 (E.D. Va. 1991) (citation omitted).  "The right is based upon the promise to return the money which the law implies, irrespective of any actual promise, and even against the refusal to make it, whenever the circumstances are such that *ex aequo et bono* the money should be paid back, but in such case only." *Willis N. Am. Inc. v. Walters*, No. 3:10cv462, 2011 WL 1226032, at *3 (E.D. Va. Mar. 30, 2011) (internal quotation marks and citation omitted).  As the Restatement of Restitution explains:  "A person who has paid money to another because of an erroneous belief induced by a mistake of fact . . . is entitled to restitution of the amount so paid . . . ." *Id.*

### 2.    Legal Standard:  Unjust Enrichment

"Under Virginia law, unjust enrichment is an implied contract action based on the principles of equity." *Butts v. Weltman, Weinberg & Reis Co.*, No. 1:13cv1026, 2013 WL 6039040, at *2 (E.D. Va. Nov. 14, 2013) (citations omitted).  "A claim for unjust enrichment is quasi-contractual in nature and requires a plaintiff to show:  (1) it conferred a benefit on the defendant; (2) the defendant 'knew of the benefit and should reasonably have expected to repay [the plaintiff];' and (3) the defendant 'accepted or retained the benefit without paying for its value.'" *Willis N. Am. Inc.*, 2011 WL 1226032, at *3 (quoting *Schmidt v. Household Finance Corp.*, 661 S.E.2d 834, 838 (Va. 2008) (citation omitted)).

"A condition precedent to the assertion of [] a claim [of unjust enrichment] is that no express contract exists between the parties." *Butts*, 2013 WL 6039040, at *3 (citation omitted).

35

"There can be no recovery in *quantum meruit* where a valid express contract between the parties exists. Parties to an express contract are entitled to have their rights and duties adjudicated exclusively by its terms." *Id.* (internal quotation marks and citation omitted).

### 3. The Payment By Mistake and Unjust Enrichment Claims Survive the Motion to Dismiss

The Court recognizes that, as to the Government's payment by mistake and unjust enrichment claims, such claims may be asserted only in the absence of an agreement between the parties—be it oral, written, or implied-in-fact. Therefore, if this Court were to find, at a later stage of this litigation, that a "valid and enforceable" agreement governed the subject matter at issue, these equitable claims would be barred, at least to the extent the claims seek recovery for benefits conferred upon Defendants during the pendency of an agreement between the parties.

However, on a motion to dismiss, the Court sees no basis to conclude that such claims should be dismissed as a matter of law. Although Defendants and the Government indicate that such a contract may exist between NDUTIME and DMAS, (Joint Compl. ¶¶ 23–24; Mem. Supp. Mot. Dismiss Joint Compl. 12), Defendants have not yet filed an answer and it remains unclear whether the written contract would foreclose other theories of liability.

Similarly, apart from the potential existence of a contract between NDUTIME and DMAS, Defendants articulate no reason why this Court should conclude as a matter of law that claims of unjust enrichment and payment by mistake must necessarily fail. Although the existence of a contract may bar unjust enrichment claims when both parties to the lawsuit are also parties to the contract, the question here is whether Virginia law bars an unjust enrichment claim when the defendant is a party to the contract but the plaintiffs/relators—here the United States and Virginia—are not. *See Butts*, 2013 WL 6039040, at *3 (explaining that law is less settled where a contract exists but parties in case are not necessarily privy to it). This issue

36

cannot be decided on the current record because the substance of NDUTIME's contract remains unknown.

The Government's claims for payment by mistake and unjust enrichment satisfy Rule 8 and survive the Motion to Dismiss Joint Complaint. As a result, the Court will deny Defendants' Motion to Dismiss the payment by mistake and unjust enrichment claims brought in the Joint Complaint in Intervention (Counts VI and VIII). The Court next addresses the retaliation claims brought by Fortunatè and Hockaday.

### C.   The Individual Relators' Retaliation Claims Survive the Motion to Dismiss

Congress passed the FCA to discourage fraud against the federal government by contractors. *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). To that end, the FCA statute includes an anti-retaliation provision, codified in 31 U.S.C. § 3730(h), to protect whistleblowers. *Id.* at 214. Retaliation claims, in contrast to the fraud claims brought in the Joint Complaint, need only meet the requirements of Federal Rule of Civil Procedure 8. *Clark/Smoot/Russell*, 796 F.3d at 433.

### 1.   Legal Standard:  Pleading FCA and VFATA Retaliation Claims

"To plead retaliation under Section 3730(h), a plaintiff must allege that (1) he [or she] engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against him [or her] as a result."[25] *Clark/Smoot/Russell*, 796 F.3d at 433.

---

[25] At the Motion to Dismiss stage, plaintiffs "need not plead facts that constitute a *prima facie* case, [but] a plaintiff still bears the burden of alleging facts sufficient to state all the elements of her claim." *Tyler-Perkins v. Virginia Cmty. Coll. Sys.*, No. 3:18cv872, 2020 WL 130137, at *8 (E.D. Va. Jan. 10, 2020) (internal quotation marks and citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (stating that a plaintiff seeking to raise an employment discrimination claim "need not plead facts sufficient to establish a *prima facie* case of race-based discrimination to survive a motion to dismiss, but . . . the more stringent pleading standard established in *Iqbal* and *Twombly* applies."); *Young v. CHS Middle E., LLC*, 611 F. App'x 130, 133 (4th Cir. 2015) (when reviewing a decision on a motion to dismiss an FCA retaliation claim, court must focus on the allegations alone).

Regarding the first prong of an FCA retaliation claim, "protected activity," Section 3730(h) previously "defined protected activity as measures taken in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) (citation omitted). However, "in 2010, Congress amended § 3730(h) to include a second category of protected activity: that which constitutes 'other efforts to stop [one] or more violations of [the FCA].'" *Id.* at 201 (citation omitted). As a result, the 2010 amendment expanded the realm of protected activity for FCA retaliation claims by including "efforts to stop" FCA violations.[26] *See United Airlines*, 912 F.3d at 201 (recognizing that the amended FCA anti-retaliation language broadens the scope of protected activity).

_____

At the summary judgment stage, plaintiffs must establish a *prima facie* retaliation claim comprising the same three elements identified for § 3730(h). *Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 751–52 (E.D. Va. 2017) (observing that appellate courts other than the Fourth Circuit and district courts within the jurisdiction of the Fourth Circuit "have routinely applied the *McDonnell Douglas* framework to [False Claims Act] retaliation claims"). Once a plaintiff sets forth a *prima facie* case, where a case lacks direct evidence of retaliation the burden of production shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts back to the plaintiff to demonstrate that the defendant's stated reason is a pretext for retaliation. *Nifong*, 234 F. Supp. 3d at 752.

[26] Congress initially amended the FCA anti-retaliation provision through the enactment of the Fraud Enforcement and Recovery Act of 2009 (FERA). FERA expanded the scope of the anti-retaliation provision in two critical ways. First, the protections were expanded to encompass "[a]ny employee, contractor, or agent." Second, and relevant here, FERA expanded the scope of protected activity under the FCA by explicitly including "efforts to stop" violations of the FCA within the scope of protected activity. *See Manfield v. Alutiiq Int'l Sols., Inc.*, 851 F. Supp. 2d 196, 204 (D. Me. 2012) (discussing FERA amendments to FCA anti-retaliation provision). The following year, as part of the Dodd-Frank Act of 2010, Congress revisited Section 3730(h). *See U.S. ex rel. Dyer v. Raytheon Co.*, 2011 WL 3294489, at *11 (D. Mass. July 29, 2011) ("More recently, the Dodd–Frank Wall Street Reform and Consumer Protection Act (the "Dodd–Frank Act"), Pub. L. No. 111–203, 124 Stat. 1376 (2010), amended subsections of § 3730(h) further, by refining its wording and adding a third subsection as § 3730(h)(3)"). The Dodd-Frank Act amendments also expanded the provision to extend it to the "lawful acts" of "associated others" as well. *See* 31 U.S.C. § 3730(h).

"The relief provided in Code § 8.01–216.8 of the VFATA is, in fact, identical to the relief provided in the FCA under 31 U.S.C. § 3730(h)(2)." *Lewis v. City of Alexandria*, 756 S.E.2d 465, 469 (Va. 2014). Similar to the FCA, to state a claim for retaliation under the VFATA, a plaintiff must allege that that (1) he or she engaged in a protected activity; (2) the employer knew about these acts; and (3) the employer took adverse action against him or her as a result of these acts.[27] *See Brockdorff v. Wells Mgmt. Grp., LLC*, No. 3:15cv137, 2015 WL 3746241, at *5 (E.D. Va. June 15, 2015). And, like the FCA, Courts recognize two types of protected activity under the VFATA. "Courts typically consider two types of actions to be protected: if the act (1) is taken in furtherance of an action under the [VFATA], or (2) represents other efforts to stop one or more [VFATA] violations." *Atchariyakornchai v. Frederick Cty. Sanitation Auth.*, 2018 U.S. Dist. LEXIS 168897, *8 (citing *Chapins v. Nw. Cmty. Servs. Bd.*, 243 F. Supp. 3d 739, 745 (W.D. Va. Mar. 20, 2017) (setting forth definitions under the FCA)).

"Importantly, a plaintiff need not prove an underlying FCA violation because, as the Supreme Court has explained, § 3730(h) protects an employee's conduct 'even if the target of an investigation or action to be filed was innocent.'" *United States ex rel. Bachert v. Triple*

---

[27] The VFATA prohibits an employer's retaliation against an employee because the employee "has opposed any practice referenced in" the VFATA or because the employee "initiated, testified, assisted, or participated in any manner in any investigation, action or hearing" that relates to acts prohibited by the VFATA. Va. Code Ann. § 8.01–216.8. The statute further provides that an employer may not take adverse action against an employee for making efforts to stop "one or more violations" of the VFATA:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this article or other efforts to stop one or more violations of this article.

Va. Code § 8.01-216.8.

*Canopy, Inc.*, 321 F. Supp. 3d 613, 621 (E.D. Va. 2018) (quoting *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel Wilson*, 545 U.S. 409, 416 (2005)).

<strong>2.      Fortunatè's FCA and VFATA Retaliation Claims Survive the Motion to Dismiss</strong>

Fortunatè's retaliation claims against NDUTIME survive the Motion to Dismiss because her allegations satisfy the three prongs of an FCA and VFATA retaliation claim.

Fortunatè alleges that Defendants unlawfully retaliated against her in violation of the FCA and the VFATA.  Fortunatè claims that she "repeatedly raised questions with management . . . regarding the fraudulent and unethical practices she observed and/or in which she was instructed to engage." (Fortunatè Compl. 11.)  After raising her concerns, Fortunatè avers that it became clear to her that "she was seen as a nuisance by NDUTIME management and that they were determined to terminate her employment with the company." (*Id.*) NDUTIME terminated her employment on August 9, 2013, the same day that she told her supervisor "that she did not feel comfortable with and opposed NDUTIME's billing practice." (*Id.*)

Defendants move to dismiss her retaliation claims, asserting that Fortunatè "fails to provide sufficient factual information that—even if taken as true—state a claim for relief that is plausible on its face, necessitating dismissal of these allegations." (Mem. Supp. Mot. Dismiss Fortunatè Compl. 5, ECF No. 56.)  Defendants contend that Fortunatè "alleges only that she 'raised questions' with her NDUTIME co-workers and 'was seen as a nuisance by NDUTIME management' without more." (*Id.* 6.)  Defendants further argue that Fortunatè asserts she was terminated from her job for "'missing a doctor's meeting with a client (that she had in fact attended) and "'violation of policies and falsifying clinical time keeping records'" thereby affirmatively pleading that NDUTIME's cause for termination was legitimate and unrelated to a

40

protected activity." (*Id.*)  The Court considers whether Fortunatè has set forth an FCA and

VFATA retaliation claim under the requirements of Federal Rule of Civil Procedure 8, sufficient

to survive the Motion to Dismiss.

      To survive the Motion to Dismiss, Fortunatè must satisfy the three pleading elements

identified above:  that (1) she engaged in protected activity; (2) the employer knew about the

activity; and, (3) the employer took adverse action against her as a result.  *Clark/Smoot/Russell*,

796 F.3d at 433.  As to the first prong, protected activity, Fortunatè has sufficiently alleged that

she engaged in protected activity when she raised her concerns about fraudulent billing to

NDUTIME in an effort to stop a potential FCA or VFATA violation.  The Fourth Circuit has

indicated that the "efforts to stop" category of protected activity applies to an employee's

activities "motivated by an objectively reasonable belief that the employee's employer is

violating, or soon will violate, the FCA." *Carlson v. DynCorp International LLC*, 657 F. App'x

168, 172 (4th Cir. 2016).  This does not require an employee to pursue or assist in FCA

litigation, but to undertake efforts to prevent a potential FCA violation.  As the Fourth Circuit

explained in *United Airlines*, raising concerns in an email about falsification of records practice

to management constitutes sufficiently pleaded "efforts to stop" protected activity for an FCA

claim.  *Id.* at 202.

      Here, the record indicates that Fortunatè engaged in protected activity when she tried to

prevent one or more FCA or VFATA violations.  Fortunatè, during her brief tenure at

NDUTIME, raised concerns about billing practices to management.  Fortunatè specifically

alleges how management at NDUTIME instructed her to change progress notes or increase units

or time billed before submitting claims.  Similar to the allegations in *United Airlines*, Fortunatè

reported her concerns regarding billing to her clinical field supervisor and billing supervisor to

try to stop overbilling or fraudulent claims practices at NDUTIME.  These allegations suffice to satisfy the first prong of an FCA and VFATA retaliation claim at the Motion to Dismiss stage.

As to the second prong, whether NDUTIME knew about Fortunatè's actions, the limited record shows that Fortunatè raised her concerns directly to her clinical field supervisor and the billing department, and that management at NDUTIME responded to Fortunatè's emails and complaints regarding billing processes.  This suffices to show that NDUTIME had knowledge of Fortunatè's protected activity.

As to the third prong, adverse action, Fortunatè satisfies this criterion because she alleges NDUTIME terminated her from her job shortly after Fortunatè raised her concerns about billing practices.  "An employer undertakes a materially adverse action opening it to retaliation liability if it does something that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *United Airlines,* 912 F.3d at 203 (internal quotation marks and citations omitted).  Termination from employment, "following close on the heels of [a plaintiff's] numerous complaints, represents the ultimate action that an employer can take against a reasonable worker for whistleblowing." *Id.*  Here, Fortunatè alleged that NDUTIME terminated her employment and withheld pay, both adverse employment actions, shortly after she raised her concerns about fraudulent billing practices.[28]  At the motion to dismiss stage, this suffices to state an FCA and VFATA retaliation claim.  As a result, the Court will deny Defendants' Motion to Dismiss Fortunatè's Complaint.

---

[28] Defendants argue that Fortunatè worked at NDUTIME for only three months, and as such a "new and short-term employee" she could not "put a mental health organization on notice for purposes of FCA and VFATA retaliation claims by simply complaining about internal billing or documentation practices."  (Mem. Supp. Mot. Dismiss Fortunatè Compl. 8.)  But Fortunatè's short time at NDUTIME is of no moment, as a new employee could likely recognize fraudulent billing practices at any company and quickly raise concerns for FCA or VFATA purposes.  At this procedural posture, where the Court must take Fortunatè's allegations as true, the Court finds that she has sufficiently alleged an FCA and VFATA retaliation claim.

### 3.   Hockaday's Retaliation Claim Against NDUTIME Survives the Motion to Dismiss But He Cannot Maintain a Retaliation Claim Against Dr. Gipson in her Individual Capacity

Hockaday's FCA retaliation claim against NDUTIME withstands the Motion to Dismiss; but he cannot maintain a retaliation claim against Dr. Gipson in her individual capacity.

Hockaday alleges that Defendants unlawfully retaliated against him in violation of 21 U.S.C. § 3730(h) after he emailed Dr. Gipson regarding his concerns about the provider intakes and overbilling practices. (Hockaday Compl. 47.) Hockaday claims that after he lodged his complaints, Defendants retaliated against him by threatening him with termination and diminishing his job duties. (*Id.*)

Defendants move to dismiss his retaliation claim, asserting that it "fails because the allegations do not establish that he engaged in protected activity, much less that anyone at NDUTIME knew that he was engaged in protected activity and retaliated against him for it." (Mem. Supp. Mot. Dismiss Hockaday Compl. 3, ECF No. 54.) Defendants further argue that Hockaday alleged only "the existence of an internal complaint – the email he allegedly sent to Dr. Gipson on December 1, 2016, refusing to participate in certain alleged activities." (*Id.* 8.) In any event, Defendants contend that Dr. Gipson cannot be "individually liable for his retaliation claim [because] the FCA's retaliation provisions only create a cause of action against a plaintiff's employer, not individual supervisors." (*Id.* 10.)

To survive the Motion to Dismiss, Hockaday must satisfy the same three pleading elements identified above, that (1) he engaged in protected activity; (2) the employer knew about the activity; and; (3) the employer took adverse action against him as a result. *Clark/Smoot/Russell*, 796 F.3d at 433. Taking Hockaday's allegations as true, as the Court must

at this stage of the litigation, the Court finds that Hockaday has alleged an FCA retaliation claim against NDUTIME.

As to the first prong, protected activity, Hockaday alleges he informed Defendants that he "would no longer conduct specific provider intakes, backdate specific provider intake forms, or otherwise engage in practices that [he] felt were violations of the law." (Hockaday Compl. ¶ 153.) Hockaday stated in an email to Dr. Gipson, dated December 1, 2016, that he "could no longer condone NDUTIME's overbilling of clients and assigning counselors to treat and bill for multiple clients in a single day." (Hockaday Compl. ¶ 154.) These factual allegations suffice to bring Hockaday's conduct into the realm of FCA protected activity, as he tried to stop a potential FCA violation.

As to the second prong, whether Defendants knew about his actions, Hockaday alleges that he contacted Dr. Gipson directly regarding his concerns about NDUTIME overbilling practices and potentially fraudulent claims. (*Id.*) Hockaday avers that Defendants received his complaints and diminished his job responsibility in response to his billing concerns. (*Id.* ¶ 155.) This satisfies the second prong of an FCA retaliation claim.

As to the third prong, an adverse employment action, the Court finds that Hockaday's allegations regarding his diminished job duties and threatened termination, together with the temporal proximity of his complaints regarding billing practices, satisfy this criterion. "An employer undertakes a materially adverse action opening it to retaliation liability if it does something that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *United Airlines,* 912 F.3d at 203 (internal quotation marks and citations omitted).[29] Here, Hockaday claims that "NDUTIME diminished [his] job duties and

---

[29] As this Court recently explained in the employment context, an adverse action must be material:

threatened [him] with termination for refusing to participate in Defendants' fraud." (Hockaday Compl. ¶ 155.)  NDUTIME's alleged actions regarding the change in Hockaday's job responsibilities and threat of termination in response to his concerns about billing practices would have dissuaded a reasonable worker from engaging in FCA protected activity.  These allegations suffice at this stage of the litigation.  As a result, Hockaday has pleaded an FCA retaliation claim against NDUTIME and the Court will deny Defendants' corresponding Motion to Dismiss that claim.

To the extent Hockaday seeks to bring an FCA retaliation claim against Dr. Gipson in her individual capacity, the Court finds that such claims are barred.  *See Irving v. PAE Gov't Servs., Inc.*, 249 F. Supp. 3d 826, 831 (E.D. Va. 2017) ("there is no textual basis in § 3730(h), as amended, for allowing plaintiffs to sue individual employees of a corporate employer").  Hockaday may only maintain his FCA retaliation claim against NDUTIME.  As a result, the Court will grant Defendants' Motion to Dismiss regarding Hockaday's FCA retaliation claim against Dr. Gipson.

---

> While the analysis of an adverse action depends on the particular circumstances of the case, an adverse action must be material.  All adverse action tests require that there be an adverse employment action, which denotes some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it.  Mere dislike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment.

*Anderson v. Sch. Bd. of Gloucester Cty., Virginia*, No. 3:18cv745, 2020 WL 2832475, at *16 (E.D. Va. May 29, 2020) (internal quotation marks and citations omitted).  Nonetheless, acknowledging the limited record, the Court will allow this claim to proceed past the Motion to Dismiss stage.

### IV.  Conclusion

For the foregoing reasons, the Court will deny the Motion to Dismiss Joint Complaint, deny the Motion to Dismiss Fortunatè Complaint, and deny in part and grant in part the Motion to Dismiss Hockaday Complaint.

An appropriate order shall issue.

_____ /s/
M. Hannah Lauck
United States District Judge

Date: 9/11/20
Richmond, Virginia

46